*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MASTERS, Minors.

UNPUBLISHED
August 13, 2025
3:14 PM

Nos. 374077; 374142
Berrien Circuit Court
Family Division
LC No. 2023-000009-NA

Before: O'BRIEN, P.J., and BOONSTRA and WALLACE, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father and respondent-mother appeal as of right the termination of their parental rights to the minor children, BLM, AM, and DM, under MCL 712A.19b(3)(c)(*i*) (conditions that led to the adjudication continue to exist) and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

The Department of Health and Human Services (DHHS) took the three minor children into protective custody in February 2023. At the time, respondent-mother was living with the children in an unsanitary, overcrowded motel room with a man named Carlos Vasquez, whom respondent-mother knew had a history of suspected child abuse. Children's Protective Services (CPS) found that BLM had a bump on his head, marks on his face, and severe bruising to his back, legs, and arms, and that AM and DM had physical marks suggesting abuse. BLM told medical workers that the "bad man" who lived with them caused his injuries. CPS was also concerned that DM was sexually abused because, during a previous investigation, CPS found marks near her vagina and what appeared to be a vaginal infection.

When CPS instructed respondent-mother to have Vasquez leave the motel room, respondent-mother asked that the children be removed instead so that she and Vasquez could

---

[1] *In re Masters Minors*, unpublished order of the Court of Appeals, entered January 28, 2025 (Docket Nos. 374077 and 374142).

-1-

remain in the motel. When respondent-father learned about the children's removal from respondent-mother's care, he declined to visit the children at the hospital, insisted that he would not keep the children from respondent-mother, and said that he suspected that the children were abused but never reported it.

The DHHS provided numerous services to respondents over a period of nearly two years. Respondent-father minimally participated in the offered services, and the trial court eventually suspended his parenting time after a reporting period in which he only attended about a quarter of his scheduled visits with the children, which caused the children emotional distress. Respondent-mother eventually completed some services offered by the DHHS, but she failed to show that she could maintain a stable income or provide a safe and suitable home for the children. The trial court ultimately ruled that there were statutory grounds to terminate the parental rights of both respondents, and that termination of respondents' parental rights was in the children's best interests. These appeals followed.

## II. REASONABLE EFFORTS

Respondent-father argues that the DHHS did not make reasonable efforts to reunify him with the children because it failed to reasonably accommodate his disabilities.[2]

To preserve a claim that services provided by the DHHS were inadequate, a respondent must raise the issue in the trial court. *In re Atchley*, 341 Mich App 332, 337-338; 990 NW2d 685 (2022). Respondent-father did not contest the adequacy of the services offered to him before this appeal, so this issue is not preserved for our review.

We review unpreserved arguments for plain error. *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2; *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citations omitted).

"Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances under MCL 712A.19a(2)." *In re Rippy*, 330 Mich App 350, 355; 948 NW2d 131 (2019). As part of its reasonable efforts, the DHHS must create a case service plan "outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017). If the parent has a disability, the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. requires the DHHS to make reasonable modifications to the services or programs it

---

[2] At the start of respondent-father's argument, he "requests the [C]ourt to adopt [respondent-mother's] arguments as if they were his own." We refuse to do so because, while there may be some overlap between the parties' arguments, respondent-mother's arguments are unique to her. This opinion therefore limits consideration of respondent-father's claims of errors to the ones identified in his brief.

offers the disabled parent. *In re Hicks/Brown*, 500 Mich at 86. Absent such modifications, the DHHS fails its duty to make reasonable efforts at reunification. *Id.*

Courtney Lamer, a foster-care worker with Bethany Christian Services, was assigned to respondents' case. At a hearing early in these proceedings, Lamer explained that respondent-father submitted to a psychological evaluation, after which the psychologist, Dr. Paul Kitchen, opined that respondent-father did not need any additional help or special services because he was capable of functioning at the pace and level of an average parent. At the end of this hearing, respondent-father's counsel nevertheless requested "that additional services and help be given to [respondent-father]" due to concerns about "some cognitive issues." The court agreed that respondent-father appeared to have "some intellectual disability" and was "going to need some extra help with services," so it ordered the DHHS to provide reasonable accommodations, despite Kitchen's recommendation to the contrary. Lamer carried out this order by simplifying respondent-father's case service plan; making clear bullet points for him to follow; including respondent-father's identified helper, Michella Smith (respondent-father's mother), in the foster-care worker's communications with respondent-father; repeatedly attempting to meet with respondent-father and Smith in person to explain action steps and to make sure he understood them; setting up appointments for parenting classes and counseling; and sending frequent reminders about dates, times, and locations of his appointments. Lamer also tried all forms of communication to engage with respondent-father and Smith by sending e-mails, texts, and Facebook messages; making phone calls; and seeing them in person at any location where respondent-father felt most comfortable.

On appeal, respondent-father first contends that Kitchen's findings that respondent-father did not need reasonable accommodations for an intellectual disability "were either ignored or deemed by Ms. Lamer to be wrong." This argument is disingenuous. Lamer neither ignored nor deemed Kitchen's recommendation to be wrong—she accurately reported Kitchen's findings to the court, and the court ordered the DHHS to provide reasonable accommodations to respondent-father. That aside, as a general matter, it is unclear how providing reasonable accommodations when not strictly necessary could ever amount to reversible error. But assuming for the sake of argument that it could, such an argument cannot be heard from respondent-father in this case because *he requested the accommodations*. "Respondent may not assign as error on appeal something that [he] deemed proper in the lower court because allowing [him] to do so would permit respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

Respondent-father next contends that it was never properly determined what accommodations he needed for his cognitive disability because Kitchen's evaluation was "unreliable." Respondent-father bases this argument on evidence that respondent-father did not fully participate in the evaluation—Lamer reported that Kitchen told her that respondent-father refused to fully answer most questions and marked the same answer for most of his tests.[3] The

---

[3] Kitchen also told Lamer that respondent-father declined help with the questions, denied having trouble understanding the tests, and stated that he answered the questions that he thought were relevant.

problem for respondent-father is that neither Kitchen nor anyone else said that respondent-father's lackluster participation in Kitchen's tests prevented Kitchen from properly evaluating respondent-father. Respondent-father's foundationless assertion to that effect is not enough to establish error, let alone plain error.

Respondent-father lastly contends that the DHHS failed to reasonably accommodate his physical disability; respondent-father has a condition that causes seizures, and he contends that these seizures caused him to miss parenting-time visits, so his case service plan should have been modified to account for "visitation[s] missed due to his disability." This argument is simply not supported by the record. While the record does establish that respondent-father had seizures, respondent-father never stated that his seizures affected his ability to exercise parenting time. Respondent-father gave a variety of excuses for why he missed parenting times—for instance, sometimes he said he was sick, one time he said that he had to go to the hospital for hip pain, and another time he said that he missed a scheduled parenting-time visit because he lost his shoes. But respondent-father never said that his seizures prevented him from exercising his parenting time. We accordingly reject respondent-father's reasonable-efforts argument premised on his counterfactual assertion that he missed parenting-time visits due to his condition that caused seizures.

For these reasons, respondent-father has failed to establish that the trial court erred when it found that the DHHS provided reasonable efforts towards reunification, including reasonably accommodating respondent-father's disabilities.

## III. STATUTORY GROUNDS FOR TERMINATION

Both respondents on appeal contest the trial court's finding that petitioner established a statutory ground for termination by clear and convincing evidence.

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

To terminate a respondent's parental rights, the trial court must find that the petitioner proved at least one statutory ground for termination by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). A trial court's finding that there exists a statutory ground to terminate a respondent's parental rights is reviewed for clear error. *In re Atchley*, 341 Mich App at 343. Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). This Court generally defers to a trial court's credibility determinations given the lower court's opportunity to observe the testifying witnesses. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020).

### B. RESPONDENT-FATHER

The trial court terminated respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*) and (j). Subsection (3)(c)(*i*) permits a trial court to terminate a respondent's parental rights if the court finds the following by clear and convincing evidence:

-4-

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.  [MCL 712A.19b(3)(c)(*i*).]

The petition in this case was filed after CPS discovered evidence that the children were being abused, and upon further investigation found that they had been living in an unsanitary motel room with respondent-mother and an individual with a known history of suspected child abuse. The petition against respondent-father was filed after CPS alerted him of these allegations and he said that he had suspected that the children were being abused but left them with respondent-mother, and was otherwise unwilling to keep the children away from respondent-mother despite the suspected abuse.  Respondent-father pleaded no contest to these allegations, and, when it entered its order of adjudication, the court explained that the conditions that led to the order were respondent-father's unwillingness or inability to protect the children and care for their wellbeing.

As the case progressed, respondent-father demonstrated a general reluctance to participate in services that would show that he was willing and able to care for the children, and much of his conduct effectively confirmed the opposite.  Respondent-father routinely missed parenting-time visits despite knowing that his missed visits caused the children emotional distress.  Towards the end of the proceedings, respondent-father missed his scheduled visits so often that the trial court suspended respondent-father's parenting time to prevent the emotional turmoil that respondent-father's missed visits were causing the children.  And even when respondent-father attended parenting times, he showed an inability to care for and protect the children.  Respondent-father would frequently leave the children unattended in public; failed to discipline or redirect the children; and regularly forgot to supply food and diapers for the children, despite repeated reminders from Lamer.  When workers tried to remind respondent-father of parenting skills or give him suggestions during these parenting-time visits, he was unreceptive, often cursing and raising his voice, thus showing a general unwillingness to address his issues and learn basic parenting skills.

The DHHS tried to help respondent-father develop his parenting skills in other ways outside of parenting times, but he was unreceptive.  Lamer testified that she referred respondent-father to multiple parenting classes that he began but then stopped attending.  Lamer also set up respondent with a supportive-visitation coach, but respondent frequently failed to attend the meetings or canceled them, and ultimately stopped participating because he did not get along with the facilitator.  On the counseling front, when Lamer first brought up the issue with respondent-father, he told her that he wanted to pick his own counselor.  But, despite Lamer's encouragement, respondent-father did not start counseling until July 2024—18 months after the case began, and one month before the trial court ordered the DHHS to petition to terminate respondent-father's parental rights.

In the face of this evidence demonstrating that respondent-father had not made reasonable progress towards rectifying the conditions that led to his adjudication, respondent-father contends that the trial court should have placed special emphasis on the testimony of respondent-father's

counselor, Faith Shreve, to find that termination was improper because respondent-father could have rectified the conditions within a reasonable time. Respondent-father had been in counseling with Shreve for several months by the time she testified in December 2024, and she said that he attended counseling twice a month. According to Shreve, respondent-father was making progress in counseling, and she believed that he could "[p]otentially" progress to the point that reunification was appropriate at some point in the future. But Shreve admitted that she had not reviewed respondent-father's case file (despite requesting it), that she had never seen the children or respondent-father visit with them, and that children who experienced trauma like the children had in this case have a greater need for stability and finality. After that last admission, Shreve testified that she was "not sure" that respondent-father could overcome the barriers to reunification within a reasonable time given the children's ages.

Contrary to respondent-father's argument, Shreve's testimony did not clearly support that termination was improper under MCL 712A.19b(3)(c)(*i*). True, parts of Shreve's testimony support respondent-father's argument, but Shreve candidly admitted that she was not fully informed about respondent-father's case, and that she only knew what he had told her. More pointedly, Shreve was "not sure" that respondent could rectify the conditions that led to his adjudication within a reasonable time considering the children's ages.

In sum, respondent-father's unwillingness or inability to protect the children and care for their wellbeing is what led to his adjudication, and, by the end of this case, that condition remained. Through most of the case, respondent-father refused to participate in programs designed to teach him the skills to protect and care for the children; he frequently missed parenting times despite the emotional harm that it caused the children; and when he attended parenting time, he showed an inability to protect the children or care for their wellbeing, and an unwillingness to learn how to do so. While, according to Shreve, respondent-father was making mild progress towards the end of the case, even she was "not sure" whether it was reasonably likely that respondent-father could overcome the barriers to reunification within a reasonable time given the children's ages. Given that this case had been ongoing for nearly two years by the time of the termination trial, and considering the minimal progress that respondent-father had made in that time, we are not definitely and firmly convinced that the trial court made a mistake when it found that there was no reasonable likelihood that respondent-father would rectify the conditions that led to adjudication within a reasonable time considering the children's ages. The trial court therefore did not clearly err when it terminated respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*).[4]

C. RESPONDENT-MOTHER

The trial court also terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*). As recounted above, the petition in this case was filed after the children showed signs of having been abused, and CPS discovered that the children had been living in an unsanitary motel room with respondent-mother and an individual with a known history of suspected child

---

[4] We need not address the trial court's finding that termination was proper under MCL 712A.19b(3)(j) because only one statutory ground for termination of parental rights must be established. See *In re Moss*, 301 Mich App at 80.

-6-

abuse. Numerous conditions ultimately led to the adjudication of respondent-mother, including parenting skills, substance abuse, emotional stability, stable employment, and stable housing. As the trial court recognized at the termination hearing, to respondent-mother's credit, she addressed most of these barriers. But the trial court found that termination was nevertheless proper under MCL 712A.19b(3)(c)(*i*) because respondent-mother had still not obtained stable housing and employment, and there was no reasonable likelihood that she would do so within a reasonable time considering the children's ages.

During these proceedings, respondent-mother lived in about nine different places, and she did not always report where she was living to Lamer. Respondent-mother also often failed to provide verification that she was employed, and she frequently reported that she quit or was fired from jobs. When the termination trial began in October 2024, respondent-mother was living with a boyfriend in one room of a three-bedroom apartment with eight other people and was unemployed. By the time the termination trial concluded in January 2025, though, respondent-mother was employed by Smith and was supposedly living in a trailer.

When finding that termination was proper under MCL 712A.19b(3)(c)(*i*), the trial court explained that respondent-mother's reported living situation as initially reported was not suitable because it was a single room with her significant other, "too many people" lived in the house with "too little space," and the condition of the house as reported by Lamer was unsafe for children—it had "boarded-up windows" and glass was found in the yard. The court acknowledged that respondent-mother testified that she planned to or had already moved to a trailer, but the court noted that respondent-mother admitted that the trailer was not suitable for the children because it needed "new flooring" and there was "a hole in the wall" that needed to be fixed. The court further noted the evidence that respondent-mother had lived between 8 and 10 places throughout the case and that "[n]one of them were stable." The court concluded that, taken together, this evidence established that respondent-mother was "never" able to obtain "suitable housing for herself and her three children" in the "two years or so this case has been open."

As for employment, the court found that respondent-mother had failed to verify her employment throughout the case, and that the excuses she gave as to why—which included that her dog ate her pay stub—were not believable. The court was disturbed by respondent-mother's unbelievable excuses, and it explained that the excuses made the court question the respondent-mother's credibility more generally. The court emphasized that verifying employment was a relatively simple task, and it could not understand why respondent-mother struggled with it, especially considering the progress she made on the rest of her case service plan. The court also highlighted Lamer's efforts attempting to verify respondent-mother's employment, and ultimately found that employment remained a barrier to reunification that was unlikely to be resolved within a reasonable time.

Respondent-mother argues on appeal that the trial court clearly erred by terminating her parental rights because she found a job and a new place to live by the date of the continued termination trial in December 2024. But contrary to respondent-mother's assertions, her barriers to reunification were not merely that she did not work or did not have a place to live, but that she could not maintain either a consistent source of income or a safe and suitable home, both of which placed the children at risk. That respondent-mother worked for a short time before the hearing did not establish that she could maintain an income when she did not show an ability to hold any job

for more than a short time during the 22 months that the case was pending. As for respondent-mother's housing, as the trial court correctly observed, respondent-mother admitted that the trailer that she rented was not yet suitable for the children, and she could not even show that she had the legal right to live in the trailer or that she could maintain it over time.

Respondent-mother emphasizes that Smith said that respondent-mother could move in to her home if needed, which, respondent-mother contends, constituted a safe and suitable fallback option if the trailer did not work out. But respondent-mother lived in the Smith's home for a period of time during this case while respondent-father lived there, and both respondents said that the situation was not sustainable. Additionally, Smith refused to submit to a criminal background check until just before the termination trial, and because her partner never submitted to a criminal background check, the DHHS could not determine whether Smith's home was suitable for the children. Respondent-mother does not explain how, in the face of this evidence, Smith's home was a suitable alternative.

Lastly, respondent-mother contends that the trial court clearly erred by concluding that she could not establish stable housing and employment within a reasonable time considering the children's ages because, when the trial court terminated her parental rights, respondent-mother had suitable employment and was on the verge of having suitable housing. While that is true, when the termination trial was scheduled to begin in October 2024—roughly 20 months after this case was initiated—respondent-mother had never had suitable housing, and she had never shown an ability to secure a stable source of income. As the court noted, respondent-mother represented throughout the case that she was employed, but she was never able to verify that employment, and failed to provide a sensible explanation for why. Considering that respondent-mother had failed to obtain stable employment throughout nearly two years that this case was pending and still did not have suitable housing by the time of termination, we are not definitely and firmly convinced that the trial court made a mistake by finding that there was no reasonable likelihood that respondent-mother would be able to obtain stable housing and employment within a reasonable time considering the children's ages.

We therefore conclude that the trial court did not clearly err when it found that termination of respondent-mother's parental rights was proper under MCL 712A.19b(3)(c)(*i*).[5]

## IV. THE CHILDREN'S BEST INTERESTS

Respondents also both argue that the trial court clearly erred by finding that termination of their parental rights was in the children's best interests.

## A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

After statutory grounds for termination have been established, a trial court may terminate a respondent's parental rights only if the court finds by a preponderance of the evidence that

---

[5] We need not address the trial court's finding that termination was proper under MCL 712A.19b(3)(j) because, again, only one statutory ground for termination of parental rights must be established. See *In re Moss*, 301 Mich App at 80.

termination is in the child's best interests. *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009). A trial court's finding that termination of a respondent's parental rights was in the child's best interests is reviewed for clear error. *In re Atchley*, 341 Mich App at 346.

The focus of the best-interest analysis is the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). When determining whether termination is in a child's best interests, a court can consider factors like the child's bond with the parents, the parent's parenting ability, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in the parent's care, the child's need for stability and finality, the length of time the child was in care, and the advantages of the child's foster placement over the parent's home. *In re Rippy*, 330 Mich App at 360.

## B. RESPONDENT-FATHER

When the trial court addressed whether it was in the children's best interests to terminate respondent-father's parental rights, it began by recognizing the children's bond with respondent-father, but correctly noted that its best-interest analysis must look at more than that. The court then found that respondent-father had failed to demonstrate that he could provide the children "with the care, permanency, stability, and finality" that they needed. It noted that respondent-father had failed to comply with his case service plan, found that he had not benefitted from the offered services, and found that respondent-father lacked the parenting ability needed "to deal with these kids in this case," who had special needs. The court acknowledged that respondent-father loved all three children but emphasized that the issue was that he had not demonstrated an ability to safely parent the children. The court then highlighted the behavioral issues that BLM in particular was dealing with and found that he was most in need of permanency and stability, but also noted that the other children needed those things due to their young ages. For these reasons, the court found that termination of respondent-father's parental rights was in the children's best interests.

On appeal, respondent-father emphasizes the bond that he had with the children, but the trial court explicitly considered that fact during its best-interest analysis, and respondent-father does not explain how the trial court failed to adequately consider respondent-father's bond with the children. Indeed, the trial court highlighted respondent-father's bond with the children multiple times and explained at length why termination was nevertheless in the children's best interests.

Respondent-father also contends that foster care could not provide the children with permanency and stability because the children were moved to multiple foster placements throughout the pendency of this case. We are not persuaded. While the children were moved to several placements throughout the case due mostly to behavioral issues, the evidence supported that the children demonstrated improvements when they had consistency and stability, and respondent-father had not demonstrated an ability to provide that. The children's foster placements, in contrast, had. We are therefore not definitely and firmly convinced that the trial court made a mistake by finding that terminating respondent-father's parental rights would provide the children with greater permanency and stability.

Respondent-father lastly contends that he "demonstrated, beyond any doubt, that he is committed to being a good parent to the children." But the record evinces that, throughout this

case, respondent-father did virtually nothing to reunite with the children. He failed to comply with his case service plan and did not benefit from any of the services offered; he routinely failed to exercise parenting time despite the emotional distress that this caused the children; and he demonstrated a lack of parenting skills and a lack of desire to learn these skills. In short, respondent-father's assertion that he was "committed to being a good parent to the children" is belied by the record.

The trial court thoroughly explained why it found that terminating respondent-father's parental rights was in the children's best interests, and none of respondent-father's arguments on appeal persuade us that this finding was clearly erroneous.

## C. RESPONDENT-MOTHER

When finding that termination of respondent-mother's parental rights was in the children's best interests, the trial court noted respondent-mother's bond with the children, and highlighted the fact that she partially completed her case service plan. But the court also noted the length of time that this case had been pending and the children's need for permanency and finality. The court found that respondent-mother's inability to secure stable housing and employment was reflective of an inability to provide for the needs of the children, and the court contrasted that to the children's treatment while in their foster placement, where the children's needs were being met. The court further found that it was unlikely that the children would be returned to respondent-mother's care in the foreseeable future because, while she had "showed some benefits" from her case service plan, she "did not fully comply with" her plan in the almost two years that this case had been ongoing. The court also explicitly considered whether a guardianship under MCL 712a.19a was appropriate in this case, and concluded that it was not. In closing, the court acknowledged that respondent-mother loved her children, but it emphasized that the children needed permanency, stability, and finality, particularly due to their ongoing behavioral issues, and it believed that the best way to achieve this was by terminating respondent-mother's parental rights.

Respondent-mother argues that, in making its best-interest decision, the trial court improperly considered certain testimony that constituted expert testimony, which the witnesses were not qualified to provide. This issue is waived, however, because respondent-mother cites no legal authority in support of her argument and fails to adequately address the merits of her claim. See *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020). Even considering the argument, the testimony that respondent-mother takes issue with was provided by Lamer and her supervisor, and the testimony was clearly limited to their opinions on what they rationally perceived, i.e., it was lay witness testimony. See MRE 701.

Respondent-mother also argues that the trial court erred by finding that terminating her parental rights would provide the children with permanency and stability because they had been moved to multiple foster placements during the pendency of this case. As explained above, the evidence supported that the children demonstrated improvements when they had consistency and stability, and like respondent-father, respondent-mother had not demonstrated that she could provide the children with the stable environment that they needed to thrive. In contrast, the children had shown improvement in their foster placement when they had stability and consistency, and the foster placements had also shown that they were more equipped than

respondent-mother to provide this type of environment. We are therefore not definitely and firmly convinced that the trial court made a mistake by finding that terminating respondent-mother's parental rights would provide the children with greater permanency and stability.

Respondent-mother further argues that the trial court did not actually consider a guardianship because it had already predetermined that it was not going to grant a guardianship by the time it rendered its decision. We disagree. The trial court explicitly considered the possibility of a guardianship and explained why it did not believe a guardianship was appropriate in this case. The trial court's ruling on the record reflects that it carefully considered the pertinent factors, and nothing suggests that it was predisposed to reject the possibility of a guardianship, as respondent-mother contends.

Respondent-mother lastly suggests that there was a blanket policy against guardianships in this case, but nothing in the record supports this. Instead, the record supports that the DHHS repeatedly tried to explore the possibility of a guardianship, but their efforts were stifled by the lack of cooperation by the potential guardians, primarily Smith.

We accordingly conclude that respondent-mother has failed to establish that the trial court clearly erred when it found that termination of respondent-mother's parental rights was in the children's best interests.

Affirmed.


/s/ Colleen A. O'Brien
/s/ Mark T. Boonstra
/s/ Randy J. Wallace

-11-